UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CITGO PETROLEUM CORPORATION, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION H-07-2950 |
| | § | |
| ODFJELL SEACHEM, *et al.,* | § | |
| | § | |
| *Defendants.* | § | |

ORDER

Pending before the court is (1) defendant YPF, S.A.'s ("YPF") motion for summary judgment (Dkt. 101); (2) plaintiff Citgo Petroleum Company's ("Citgo") motion for continuance of submission date (Dkt. 115); (3) Citgo's motion for sanctions (Dkt. 114); and (4) YPF's motion to file a surreply (Dkt. 128). Having considered the motions, related filings, and applicable law, the court is of the opinion that the motion for summary judgment (Dkt. 101) should be DENIED, the motion for continuance of submission date (Dkt. 115) should be GRANTED, the motion to file a surreply (Dkt. 128) should be GRANTED, and the motion for sanctions (Dkt. 114) should be GRANTED IN PART AND DENIED IN PART.

I. BACKGROUND

This is a breach of contract claim stemming from a January 13, 2005, contract between YPF and Tricon Energy, Ltd. for the sale of 4,000 MT of cyclohexane. Dkt. 1. YPF sold the cyclohexane to Tricon and agreed to ship the cargo from Argentina to Houston, Texas, with a delivery window of February 15 through March 15, 2005. *Id.* Under the contract, YPF was required to load the cargo between February 15 and March 5, 2005. Dkt. 113, Ex. 2. Tricon sold the cyclohexane to Citgo under a sales agreement dated March 9, 2005, and agreed to ship the cargo to Freeport, Texas, with

a delivery window between April 15 and 20, 2005. Dkt. 1. The agreements stated that the cargo would be shipped on board the BOW FIGHTER. *See* Dkt. 101, Exs. A, B. The BOW FIGHTER did not arrive in La Plata, Argentina until March 17, 2005. Dkt. 1; Dkt. 116, Ex. D. YPF sent Tricon an email on March 14, 2005, stating that the BOW FIGHTER would be delayed until March 18, 2005. Dkt. 116, Ex. E. YPF requested an extension of the load date until March 23, 2005. *Id.* YPF sent a separate email advising that it needed standby letters of credit. *Id.* On March 16, 2005, Tricon sent YPF amended letters of credit for the BOW FIGHTER. Dkt. 116, Ex. F. The amended letters replaced the previous load date of no later than March 17, 2005, with a load date of no later than March 23, 2005. *Id.*

YPF loaded the cargo, and the BOW FIGHTER set sail for Houston on March 19, 2005. Dkt. 1; Dkt. 116, Ex. D. Citgo claims the BOW FIGHTER was unseaworthy prior to the inception of the voyage due to pre-existing engine problems. Dkt. 1. While en route to Houston, the BOW FIGHTER suffered a major engine breakdown and deviated to Philadelphia for repairs. *Id.* The repairs delayed the arrival of the cargo in Houston and Freeport by nearly two months. *Id.* Citgo claims that the market price for cyclohexane had plummeted in the interim. *Id.*

Citgo settled with Tricon and, under the terms of the agreement, can pursue Tricon's claim for its loss of $450, 000. Dkt. 1. On September 13, 2007, Citgo brought claims against the BOW FIGHTER, Odfjell Seacem (the owner of the BOW FIGHTER), and YPF, as subrogee of Tricon, and against Odfjell Seachem and YPF in its own right. *Id.* Odfjell and the BOW FIGHTER (through Odfjell Asia) filed a motion to dismiss Citgo's claims against them because the arbitration provision in the charter party mandated arbitration of disputes in London. Dkt. 17. The court determined that

the parties were bound by the arbitration provision and dismissed Citgo's claims against Odfjell and the BOW FIGHTER with prejudice. Dkt. 40.

YPF later filed a third-party claim against Odfjell and the BOW FIGHTER, which Odfjell and the BOW FIGHTER (through Odfjell Asia) moved to dismiss because the claims were subject to arbitration. Dkts. 59-61. YPF moved for a stay of its third-party claims pending arbitration, and it moved for a stay relating to Citgo's claims against YPF. Dkts. 61, 66, 67. The court granted the stay. Dkt. 73. Neither Citgo nor YPF, however, ever initiated arbitrations against Odfjell. Dkts. 75, 77. Citgo eventually moved to reopen the case, and the court reopened the case on June 30, 2011, and entered a new scheduled order on December 22, 2011.[1] Dkts. 87, 92.

The new scheduling order required that discovery be completed by November 20, 2012. Dkt. 92. Citgo, however, had to request Letters Rogatory to depose individuals in Argentina and Spain pursuant to the Hague Convention. Dkt. 93. Citgo originally moved for issuance of the letters on January 25, 2012. Dkt. 93. The court signed the letters on January 27, 2012. Dkt. 95. Unfortunately, on July 11, 2012, the court received a letter from the Department of State of Justice in Spain indicating that it was impossible for it to carry out the court's request to obtain evidence in Spain due to lack of time. Dkt. 100, Ex. 4. Citgo thereafter moved to extend the discovery deadline by ten months in order to allow the taking of depositions of the foreign witnesses. Dkt. 103. YPF agreed to the extension. *Id.* The discovery deadline is now September 30, 2013. Dkt. 107.

On October 18, 2012, YPF filed a motion for summary judgment. Dkt. 101. Citgo filed a response, after a brief continuance, on December 12, 2012. Dkt. 109. YPF timely filed a reply. Dkt. 116. Citgo requested in its response that the court deny YPF's motion on res judicata grounds or,

---

[1] For a more detailed procedural history of this case, see docket entry 87.

in the alternative, that the court provide additional time for Citgo to respond to YPF's substantive arguments. Dkt 109. On February 5, 2013, the court issued an order informing Citgo that it intended to address YPF's substantive arguments and allowing Citgo to file a supplemental response and YPF to file a supplemental reply. Dkt. 111. The parties submitted their supplemental briefing. Dkts. 112, 116. However, Citgo also filed a motion for sanctions, arguing that YPF breached its obligations to present a competent and prepared Rule 30(b)(6) corporate representative for deposition and interfered with Citgo's attempt to obtain voluntary depositions of witnesses, thus impeding Citgo's discovery. Dkt. 114. Citgo requested in the motion that the court strike YPF's defenses raised in its motion for summary judgment, defer considering the motion for summary judgment until Citgo had a chance to conduct a complete Rule 30(b)(6) deposition, enter a factual finding that YPF knew or could not have been unaware of the BOW FIGHTER's mechanical condition, or reimburse the costs and fees expended for the deposition. Dkt. 114. Citgo also filed a motion requesting that the court delay considering the motion for summary judgment until the submission date for the motion for sanctions. Dkt. 115. The motion to delay consideration of the motion for summary judgment until the court considers the motions for sanctions (Dkt. 115) is GRANTED. YPF's motion to file a surreply (Dkt. 128) is GRANTED, and the court has considered the arguments in the surreply, which was attached to YPF's motion. The court herein considers both the motion for summary judgment and the motion for sanctions.

## II. Motion for Summary Judgment

YPF moves for summary judgment Citgo's claim arguing that it is preempted by the United Nations Convention for the International Sale of Goods ("CISG"). Dkt. 101. YPF argues first that Citgo's claims should be dismissed because it pled a state law breach of contract claim rather than

a violation of the CISG. *Id.* YPF argues next that, even if the court construes Citgo's complaint as alleging a claim under the CISG, the claim should be dismissed because the contract only required YPF to deliver the cyclohexane over the BOW FIGHTER's rails, which it did, and there is no duty under the CISG to engage a reasonable carrier. *Id.*

Citgo argues that summary judgment is inappropriate first because YPF breached the terms of the original contract between Tricon and YPF when it failed to load the cargo by the required date, and YPF has not shown that Tricon ever accepted the modified date that YPF proposed. Dkt. 112. Next, Citgo asserts that it does not matter if the CISG preempts Citgo's Texas state law claims, as the CISG recognizes a cause of action for breach of contract on terms essentially identical to Texas law. *Id.* Citgo claims that the CISG requires YPF to act reasonably and in good faith in the performance of a contract, and that YPF did not do so when it engaged the BOW FIGHTER, as it knew or could have discovered the problems with the BOW FIGHTER with reasonable effort. *Id.* Citgo contends that YPF knew or could not have been unaware that the BOW FIGHTER had issues before it delivered the cargo over her rails, and that YPF was therefore in breach of its duties under the CISG. Citgo requests that the court deny YPF's motion for summary judgment because there is a question of material fact as to whether YPF breached its duty by loading cargo onboard a vessel that was incapable of carrying the cargo. *Id.* Citgo urges the court to deny the motion for summary judgment as there are fact issues with regard to the vessel's nomination, the controlling agreement, and the extent of YPF's knowledge, and Citgo asserts that it is entitled to continue discovery to resolve these issues before finally presenting its case on the merits. *Id.*

A.    **Legal Standard**

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Carrizales v. State Farm Lloyds*, 518 F.3d 343, 345 (5th Cir. 2008).  The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; there must be an absence of any genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S. Ct. 2505 (1986).  An issue is "material" if its resolution could affect the outcome of the action.  *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007).  "[A]nd a fact is genuinely in dispute only if a reasonable jury could return a verdict for the non-moving party."  *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).

The moving party bears the initial burden of informing the court of all evidence demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986).  Only when the moving party has discharged this initial burden does the burden shift to the non-moving party to demonstrate that there is a genuine issue of material fact.  *Id.* at 322.  If the moving party fails to meet this burden, then it is not entitled to a summary judgment, and no defense to the motion is required.  *Id* .  "For any matter on which the non-movant would bear the burden of proof at trial . . . , the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial."  *Transamerica Ins. Co. v. Avenell* , 66 F.3d 715, 718–19 (5th Cir. 1995); *see also Celotex*, 477 U.S. at 323–25. To prevent summary

judgment, "the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986) (quoting Fed. R. Civ. P. 56(e)).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant and draw all justifiable inferences in favor of the non-movant. *Envl. Conservation Org. v. City of Dallas, Tex.*, 529 F.3d 519, 524 (5th Cir. 2008). The court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence; disregard all evidence favorable to the moving party that the jury is not required to believe; and give credence to the evidence favoring the non-moving party as well as to the evidence supporting the moving party that is uncontradicted and unimpeached. *Moore v. Willis Ind. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000). However, the non-movant cannot avoid summary judgment simply by presenting "conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation." *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). By the same token, the moving party will not meet its burden of proof based on conclusory "bald assertions of ultimate facts." *Gossett v. Du-Ra-Kel Corp.*, 569 F.2d 869, 872 (5th Cir. 1978); *see also Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1221 (5th Cir. 1985).

## B.    Preemption

YPF argues that the CISG preempts Citgo's state law contract claims. Dkt. 101. The CISG was ratified by the U.S. Senate in 1986. United Nations Convention on Contracts for the International Sale of Goods, *opened for signature* Apr. 11, 1980, 19 I.L.M. 668; *see BP Oil Int'l, Ltd. v. Empresa Estatal Petroleos de Ecuador*, 332 F.3d 333, 336 (5th Cir. 2003). It "creates a private

right of action in federal court" and "applies to 'contracts of sale of goods between parties whose places of business are in different States . . . [w]hen the States are Contracting States.'" *Id.* (quoting CISG art. 1(1)(a)). Here, the contract at issue is between citizens of Argentina and the United States, both of which are contracting states. *See Forestal Guarani S.A. v. Daros Int'l, Inc.*, 613 F.3d 395, 397 (3d Cir. 2010) (noting that the United States ratified the CISG in 1986, Argentina ratified it in 1983, and it became effective in both countries in 1988). Thus, it appears the CISG applies.

Citgo contends that YPF's argument that Citgo's state law claims are preempted by the CISG is misleading and ultimately irrelevant because Citgo pled that YPF breached its contract with Tricon, and both the UCC and the CISG provide for liability for the breach of contract. Dkt. 112 at 12-13. Citgo argues that the CISG recognizes a cause of action for breach of contract on terms essentially identical to those employed by the UCC, so YPF's argument presents a distinction without a difference. *Id.* at 13.

YPF contends, however, that Citgo has not pleaded a cause of action under the CISG. Dkt. 116. YPF argues that Citgo is bound by its pleadings, has never asserted a claim under the CISG, and should not be allowed to do so now. *Id.*

Citgo's complaint asserts a general breach of contract claim against YPF. Dkt. 1. The CISG applies to contracts for the sale of goods between parties of signatory states. *BP Oil*, 332 F.3d at 336. "As incorporated federal law, the CISG governs this dispute so long as the parties have not elected to exclude its application." *Id.* Neither party argues that either contract at issue excludes the CISG's application. The court does not believe that the fact that Citgo did not mention the CISG in its complaint is fatal to its claim, since it asserted a breach of contract claim and the CISG is merely the law that governs that claim. Thus, the court finds that the CISG applies, a fact that the

parties do not appear to dispute, and that Citgo may pursue its breach of contract claim against YPF under the CISG even though it did not specifically invoke the CISG in its complaint.

## C.     CISG

Under YPF and Tricon's contract, YPF was required to ship the cyclohexane CFR.  "CFR," which stands for "Cost and FReight," is an International Commercial Term ("Incoterm") defined by the International Chamber of Commerce ("ICC").  *BP Oil*, 332 F.3d at 335.  The ICC defines eleven different Incoterms to aid in the interpretation of "the most commonly used trade terms in foreign trade."[2]   Internal Chamber of Commerce, *From 1936 to Today: The Incoterms Rules*, http://www.iccwbo.org/products-and-services/trade-facilitation/incoterms-2010/history-of-the-incoterms-rules/ (last visited May 13, 2013).  The ICC Incoterms are incorporated into the CISG treaty through article 9(2).  *See BP Oil*, 332 F.3d at 337.  Under article 9(2),

> The parties are considered, unless otherwise agreed, to have impliedly made applicable to their contract or its formation a usage of which the parties knew or ought to have known and which in international trade is widely known to, and regularly observed by, parties to contracts of the type involved in the particular trade concerned.

CISG art. 9(2).  The CFR Incoterm

> means that the seller delivers the goods on board the vessel or procures the goods already so delivered.  The risk of loss of or damage to the goods passes when the goods are on board the vessel.

---

[2] The court in *BP Oil* noted that there were 13 Incoterms.  *BP Oil*, 332 F.3d at 335.  It was, however, referring to the 1990 version of the Incoterms.  In 2010, the ICC replaced DAF, DES, DEQ, and DDU with DAT and DAP.  International Chamber of Commerce, *Incoterms 2010: Introduction* (2010), http://www.iccwbo.org/products-and-services/trade-facilitation/incoterms-2010/the-incoterms-rules/ (follow "Download the foreword to Incoterms 2010" hyperlink) (last visited May 13, 2013).  The term CFR did not change with the 2000 or 2010 revisions.  *See* International Chamber of Commerce, *From 1936 to Today: The Incoterms Rules*, http://www.iccwbo.org/products-and-services/trade-facilitation/history-of-the-incoterms-rules/ (last visited May 13, 2013).

> The seller must contract for and pay the costs and freight necessary
> to bring the goods to the named port of destination.

International Chamber of Commerce, *The Incoterms Rules*, http://www.iccwbo.org/products-and-services/trade-facilitation/incoterms-2010/the-incoterms-rules/ (last visited May 13, 2013).

YPF argues that according to the Incoterm, the risk of loss passed to Tricon as soon as YPF delivered the cyclohexane to the BOW FIGHTER's rails and that YPF, as a CFR seller, had no obligation under the CISG to engage a "reasonable carrier."  Dkt. 101 at 8.  Citgo argues that YPF had an obligation under the CISG to act reasonably and in good faith in the performance of its obligations under the sales contract.  Dkt. 112.  Citgo additionally argues that YPF had already breached the contract when it loaded the cargo, and the CISG articles pertaining to passing the risk do not impair its remedies for breach.  *Id.*

### 1.      Duty to Act Reasonably and in Good Faith

Citgo argues that YPF had a duty to act reasonably and in good faith under the CISG and that it breached that duty when it placed the cyclohexane on a vessel that was not capable of delivering the cargo.  Dkt. 112.  It also argues that under article 32 of the CISG, YPF was required to arrange for carriage of the goods by a means of transportation "appropriate in the circumstances" and that YPF was thus bound to exercise reasonable care and good faith when it arranged for carriage of the cargo, ensuring that the vessel was appropriate.  *Id.*  CITGO additionally argues that under article 79 of the CISG, which states that a party is not liable for failure to perform if it proves failure due to an impediment beyond its control, YPF had an obligation to take into account reasonably foreseeable impediments to the delivery of the cyclohexane.  *Id.*

YPF argues that Citgo has not pleaded a negligence claim against YPF, and the allegations that YPF should have exercised reasonable care sound in negligence.  Dkt. 116.  YPF claims that the

purpose of a CFR contract is to place the risk of loss on the buyer, and that its obligation as a CFR seller was merely to place the cargo on a vessel of the type normally used for the transport of cyclohexane, which it fulfilled.  *Id.*  As far as Citgo's argument that the CISG required YPF to exercise reasonable care and good faith in arranging for the carriage of the cargo under article 32, YPF claims that article 32 is merely a "stop-gap" and only applies absent a contrary agreement of the parties.  *Id.*  According to YPF, the agreement to ship CFR and thus transfer the risk to the seller when the cargo was loaded was a contrary agreement.  *Id.*  YPF argues that article 79 is not on point as both Tricon and Citgo agreed to the use of the BOW FIGHTER.

Citgo relies first on *BP Oil* for its argument that YPF had a duty to act reasonably and in good faith under the CISG.  In *BP Oil*, the Fifth Circuit considered whether a district court appropriately granted summary judgment on a breach of contract claim involving a contract for the purchase and transport of gasoline from Texas to Ecuador.  *BP Oil*, 332 F.3d at 334.  BP Oil International, Ltd. ("BP") contracted with Empresa Estatal Petroleos de Ecuador ("PetroEcuador") for the purchase of 140,000 barrels of gasoline delivered CFR to Ecuador.  *Id.* at 335.  The gasoline was to have a gum content of less than three milligrams per one hundred milliliters, to be determined at the port of departure.  *Id.*  BP had the gasoline tested and loaded it aboard a ship at Shell's Deer Park refinery. *Id.*  The ship sailed to Ecuador, and the gasoline was tested for gum content.  *Id.*  The gum content exceeded the contractual limitation when tested in Ecuador, and PetroEcuador refused to accept delivery.  *Id.*  BP resold the gasoline at a loss of about $2 million.  *Id.*  BP sued PetroEcuador for breach of contract and wrongful draw of a letter of guarantee.  *Id.*  The district court applied Texas choice of law rules and determined that Ecuadorian law governed the breach of contract claim.  *Id.* It held that under Ecuadorian law, BP was required to tender conforming goods to the

destination—in this case Ecuador—and granted summary judgment in favor of PetroEcuador. *Id.* BP appealed, arguing that the CISG applies and that, since it was a CFR seller, the risk of loss passed to PetroEcuador after BP delivered conforming goods on board the ship. *Id.* at 335-36.

The Fifth Circuit held that the CISG applied as incorporated federal law. *Id.* at 337. It then noted that the CISG incorporates Incoterms, including CFR, and that "[s]hipments designated 'CFR' require the seller to pay the costs and freight to transport the goods to the delivery port, but pass title and risk of loss to the buyer once the goods 'pass the ship's rail' at the port of shipment." *Id.* at 338. It held that BP fulfilled its contractual obligations if the gasoline met the contract's gum content requirement when it passed the ship's rail pursuant to article 36(1) of the CISG. *Id.* PetroEcuador argued that BP cut corners by buying the gasoline "as is" from Shell and failing to add sufficient gum inhibitor. *Id.* The Fifth Circuit, relying on article 40 of the CISG, noted that "BP could have breached the agreement if it provided goods that it 'knew or could not have been unaware' were defective when they 'passed over the ship's rail' and the risk shifted to PetroEcuador." *Id.* The court held that there was "a fact issue as to whether BP provided defective gasoline by failing to add sufficient gum inhibitor" and that the district court should permit discovery on this issue. *Id.* at 339.

The articles relied upon by the *BP Oil* court with regard to the "knew or could not have been unaware" standard—articles 38 through 40—have to do with whether the goods delivered were conforming goods. *See* CISG arts. 38-40. Citgo relies on this standard to argue that YFP had a duty to act reasonably and in good faith. Dkt. 112 at 2. Article 40 states that the "seller is not entitled to rely on the provisions of articles 38 and 39," which relate to the buyer examining the goods for conformity and giving notice to the seller about lack of conformity, "if the lack of conformity relates to facts of which [the seller] knew or could not have been unaware and which [the seller] did not disclose to the buyer." CISG arts. 38-40. Citgo argues that there is a fact issue with regard to

whether YPF knew or should have known that there were issues with the BOW FIGHTER that would cause delays in the arrival of its cargo and that this fact issue precludes summary judgment. Articles 38 through 40, however, do not apply here because there is no contention that the cyclohexane did not conform to the contract specification.  *Id.*  These articles do not deal with whether YPF chose a reasonable carrier.

Next, Citgo argues that YPF had a duty under article 32 of the CISG.  Under article 32(2), if "the seller is bound to arrange for carriage of the goods, he must make such contracts as are necessary for carriage to the place fixed by means of transportation appropriate in the circumstances and according to the usual terms for such transportation."  CISG art. 32(2).  According to Citgo, there is a material question of fact as to whether YPF knew the BOW FIGHTER was an inappropriate vessel, and thus summary judgment should not be granted in YPF's favor.  Dkt. 112. YPF concedes that whether it had knowledge of the pre-existing breakdowns and should have conveyed these facts to Tricon is a disputed question of fact, but it argues that it is not *material* because Citgo cannot recover even if it had such knowledge under the CISG since the risk of loss transferred to Tricon when YPF loaded the cargo.[3]  Dkts. 101, 110.  YPF asserts that article 32 only applies if there is nothing in the contract relating to the seller's delivery options.  Dkt. 116.  Since the contract used the Incoterm CFR, YPF argues that the requirements imposed on YPF as a CFR seller supersedes any requirements that would otherwise have been imposed by article 32 of the CISG.

---

[3]  Citgo provides portions of the BOW FIGHTER's Deck Logs, which demonstrate that the BOW FIGHTER had several issues with its main engine prior to arriving in La Plata.  *See* Dkt. 112, Dkt. 113, Exs. 4,-6, 8.  YPF's vetting inspector was onboard the BOW FIGHTER on March 9, 2005, to determine whether it was suitable to carry the cyclohexane.  Dkt. 113, Ex. 9.  On the same day, the log indicates the BOW FIGHTER's engine failed, forcing the BOW FIGHTER to re-moor and delaying her voyage to La Plata.  Dkt. 113, Ex. 8.

Under the CFR Incoterm, a CFR seller is obligated to (1) provide goods that conform with the contract; (2) obtain export licenses or other official authorization to export; (3) "contract on usual terms at his own expense for the carriage of the goods to the named port of destination by the usual route in a seagoing vessel . . . of the type normally used for the transport of goods of the contract description"; (4) deliver the goods on board the vessel on the date agreed; and (5) bear the risks of loss until the goods have passed the ship's rails at the port.  Dkt. 101, Ex. C at 202 (International Chamber of Commerce, Incoterms (2000)).  YPF argues that it fulfilled all of these obligations when it loaded the cyclohexane aboard the BOW FIGHTER, which is a vessel of the type normally used for the transport of cyclohexane.  Dkt. 116.

Citgo, however, argues that the article 32 of the CISG imposes an additional duty on a CFR shipper—namely, that YPF was bound to exercise reasonable care and good faith when it arranged for carriage of the cargo, regardless of whether the risk of loss passed when the cargo was loaded. Dkt. 112.  YPF does not dispute that it arranged for the BOW FIGHTER to carry the cargo.  Instead, it cites a secondary source indicating that article 32 applies only "'in the absence of contrary agreement between the parties'" and that "'[i]n practice, the agreement will spell out the seller's delivery obligations quite precisely by adopting an established shipment term . . . and less frequently by incorporating the INCOTERMS.'"  Dkt. 116 at 6 (quoting Ziegel and Samson, *Report to the Uniform Law Conference of Canada on Conventions for the International Sale of Goods* 81 (1st ed. 1981)).  However, even if the agreement spells out the seller's delivery obligations by denoting that it is a CFR contract, these delivery obligations are not necessarily contrary to a concurrent responsibility under article 32 to select an appropriate vessel.  The court finds that article 32 applies here and that YPF had an obligation to secure a "means of transportation appropriate in the

14

circumstances." There is a question of fact as to whether YPF met this obligation. YPF's motion for summary judgment on this ground is thus DENIED.[4]

### 2.     Breach of Contract Due to Loading Delay

YPF argues that it performed its contractual obligations under the contract by loading the cyclohexane aboard the BOW FIGHTER, that the risk of loss passed to the buyer as soon as it loaded the cargo because the contract was a CFR contract, and that summary judgment on Citgo's breach of contract claim should thus be granted in YPF's favor. Dkt. 101. In addition to its arguments regarding breach due to not meeting obligations imposed by the CISG to act reasonably or with good faith, Citgo argues that YPF breached its contract with Tricon by not loading the cyclohexane within the time specified in the contract (February 15-March 5, 2005), and that, pursuant to article 70 of the CISG, the articles of the CISG pertaining to passing the risk do not apply. Dkt. 112 at 12; Dkt. 113, Ex. 2. YPF argues that it was not in breach when it failed to load the cargo by March 5, 2005, because correspondence between Tricon and YPF indicates that Tricon affirmatively agreed to extend the load date until March 18, 2005. Dkt. 116. YPF additionally argues that even if Tricon had not agreed to the extension, any breach of the contract due to the delay in loading was not "fundamental" under the CISG, and that the risk therefore passed to the buyer notwithstanding the breach. Dkt. 116.

The court finds as a matter of law that Tricon accepted YPF's offer to modify the load date. YPF sent an email to Tricon advising Tricon that the BOW FIGHTER was arriving later than originally anticipated and requesting amended letters of credit from Tricon. *See* Dkt. 116, Ex. E. Tricon provided amended letters of credit with the new dates. Dkt. 116, Ex. F. Under article 18 of

---

[4] The court need not address Citgo's article 79 argument at this time since it has already determined that there is an issue of material fact with respect to article 32.

15

the CISG, a "statement made by or other conduct of the offeree indicating assent to an offer is an acceptance. Silence or inactivity does not in itself amount to acceptance." CISG art. 18(1). Tricon's provision of the amended letters of credit extending the date is "other conduct of the offeree indicating assent to an offer." Tricon thus accepted the proposed revision to the load date, and YPF's late loading of the cargo was not a breach of contract.[5]

Moreover, even if the original contract controlled, Citgo has not provided any evidence indicating that the alleged breach of the original contract by failing to load the cargo by the date specified was a fundamental breach of contract under the CISG. Under article 25 of the CISG,

> A breach of contract committed by one of the parties is fundamental if it results in such detriment to the other party as substantially to deprive him of what he is entitled to expect under the contract, unless the party in breach did not foresee and a reasonable person of the same kind in the same circumstances would not have foreseen such a result.

CISG art. 25. Article 70 states, "If the seller has committed a *fundamental* breach of contract, articles 67, 68, and 69 do not impair the remedies available on account of the breach." CISG art. 70 (emphasis added). Articles 67 through 69 deal with passing the risk to the buyer. *Id.* arts. 67-69. Here, Citgo has not provided any evidence that the four-day delay associated with the "late" loading of the cyclohexane onto the BOW FIGHTER, as opposed to the delay caused by the BOW FIGHTER's mechanical problems, caused its damages.

---

[5] Citgo has provided no evidence to the contrary. Citgo requests additional time for discovery because it has been unable to depose certain individuals from other countries due to delays relating to service of Letter Rogatory under the Hague Convention. Dkts. 109, 112. However, the court believes, given the amount of time Citgo had to provide a substantive response to YPF's motion, that it had sufficient time to gather evidence that Tricon rejected YPF's request to extend the loading date. Citgo, indeed, does not argue that Tricon rejected the offer. Instead, it argues that under section 18(1) of the CISG, silence is not assent. Dkt. 112. Tricon, however, was not completely silent on the issue, and instead took an action indicating assent.

Thus, the court finds that the delay in loading cyclohexane does not constitute a breach of contract. However, as discussed in the section above, there is an issue of material fact whether YPF breached other obligations under the contract.

### III. Motion for Sanctions

YPF presented Juan Nestor Gil as a Rule 30(b)(6) deponent on March 20-21, 2013. Citgo argues that Gil was "so woefully unprepared that the deposition was a sham and nearly useless." Dkt. 114. Citgo asserts that YPF also interfered with Citgo's efforts to obtain testimony and evidence in breach of an agreement Citgo had with YPF as well as a court directive. *Id.* Specifically, Citgo alleges that YPF agreed to assist or facilitate Citgo with contacting YPF's employees or former employees regarding being deposed and that YPF apparently interfered with Citgo's deposition attempts as witnesses who were initially cooperative later insisted on formal notice, which Citgo claims could only have happened due to improper contact and pressure by YPF. Dkt. 114. Additionally, when Citgo went to YPF's offices to depose Gil, Citgo's counsel specifically asked YPF's counsel to bring one of the witnesses to the room in which the deposition was occurring so that he could ask the witness if the witness would be willing to voluntarily submit to a deposition, and YPF's counsel refused to do so. *Id.* Citgo viewed this as a breach of the alleged agreement to assist Citgo in contacting YPF's employees about being deposed voluntarily. Citgo moves for sanctions in the form (1) reimbursement of the costs, fees, and expenses incurred in traveling to Argentina and fees associated with engaging local counsel to talk to witnesses about attending a deposition; (2) a judicial finding that YPF "knew or could not have been unaware" of the BOW FIGHTER's condition since YPF allegedly prevented Citgo from getting evidence about this

issue; or (3) alternatively, striking YPF's motion for summary judgment or deferring consideration of the motion until Citgo has the opportunity to depose a "competent Rule 30(b)(6) representative." *Id.*

YPF argues first that Citgo's motion for sanctions is untimely, as the events outlined in the motion occurred more than a year ago. Dkt. 119. YPF asserts that the only reason Citgo has filed the motion for sanctions at this point in the litigation is because YPF filed a motion for summary judgment. *Id.* Second, YPF argues that Citgo's motion has no merit because Gil conducted a reasonable investigation before being deposed, testified about information known or reasonably available to YPF, and was the most knowledgeable person at YPF about the transaction with Tricon. *Id.* YPF states that it never interfered with fact witnesses and that it is Citgo and its counsel, not YPF, that should be reprimanded for causing a disturbance in YPF headquarters while attempting to find an employee that Citgo wished to depose. *Id.*

With regard to timeliness, Citgo states that it was waiting to file its motion for sanctions until it could demonstrate, through more discovery, that Gil was unprepared and untruthful. Dkt. 125. Citgo claims that YPF forced its hand by filing a motion for summary judgment on the precise issue on which YPF prevented Citgo from conducting discovery by failing to ensure that Gil was adequately prepared. *Id.* As far as Gil's preparation, Citgo argues that YPF's assertion, supported by an affidavit, that Gil prepared for the deposition is not credible in light of Gil's testimony at the deposition. Dkt. 125. Citgo denies causing a disturbance at YPF's headquarters. *Id.*

A.    **Legal Standard**

Under Rule 37 of the Federal Rules of Civil Procedure,

> If a party or a party's officer, director, or managing agent—or a witness designated under Rule 30(b)(6) or 31(a)(4)—fails to obey an order to provide or permit discovery, including an order to provide or

permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders. They may include the following:

(I) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

(ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

(iii) striking pleadings in whole or in part;

(iv) staying further proceedings until the order is obeyed;

(v) dismissing the action or proceeding in whole or in part;

(vi) rendering default judgment against the disobedient party; or

(vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

Fed. R. Civ. P. 37(b)(2)(A).  Under Rule 37(b)(2)(C), "Instead of or in addition to the orders above, the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust."  Fed. R. Civ. P. 37(b)(2)(C).

Under Rule 37(d), a court may impose sanctions if "a party or a party's officer, director, or managing agent—or a person designated under Rule 30(b)(6) . . .—fails, after being served with proper notice, to appear for that person's deposition."  Fed. R. Civ. P. 37(d)(1)(A)(I).  Sanctions for violations of Rule 37(d) "may include any of the orders listed in Rule 37(b)(2)(A)(I)-(vi)."  Fed. R. Civ. P. 37(d)(3).  Additionally, a "court must require the party failing to act, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust."  *Id.*  "District Courts have broad discretion in determining whether to impose a sanction

19

under Rule 37 and, if so, what sanction to impose." *Sec. & Exch. Comm'n v. First Fin. Grp. of Tex., Inc.*, 659 F.2d 660, 665 (5th Cir. Oct. 1981).

**B.      Interference with Witnesses: Timeliness**

Rule 37 does not impose a specific time limit for filing motions for sanctions.  However, an unreasonable delay may render a motion for sanctions under Rule 37 untimely. *Brandt v. Vulcan, Inc.*, 30 F.3d 752, 756 (7th Cir. 1994).  Generally, "a motion for Rule 37 sanctions should be promptly made, thereby allowing the judge to rule on the matter when it is still fresh in his mind. The motion should be deemed waived if it is not made prior to judgment and if the judgment entered does not . . . expressly reserve the right to make the motion thereafter." *Mercy v. Suffolk Cnty., N.Y.*, 748 F.2d 52, 55-56 (2d Cir. 1984).

The events about which Citgo complains occurred from January through March, 2012.  Dkt. 114.  The motion for sanctions was filed February 25, 2013.  *Id.*  Citgo's reason for waiting almost a full year to file the motion for sanctions is that it was hoping to garner more evidence that Gil was unprepared by deposing other witnesses. Dkt. 125.  This, however, is no excuse for waiting to file a motion for sanctions relating to the alleged interference with witnesses.  It was not appropriate to wait for such a long period to file the motion if, indeed, the conduct with regard to the witnesses was as egregious as Citgo alleges.  Citgo argues that YPF not only breached an agreement that it had with Citgo about assisting Citgo with getting the witnesses to voluntarily appear but that YPF violated this court's order for YPF not to interfere with Citgo's efforts to obtain YPF witnesses' voluntary appearance.  *Id.*  If Citgo truly believed that YPF violated this court's order, it should have been brought to the court's attention immediately—not eleven months after the fact.  The court finds that the motion for sanctions with respect to YPF's alleged interference with Citgo's ability to obtain voluntary appearance of witnesses is untimely.

**C.     Interference with Witnesses: Proof**

Moreover, even if the motion were timely, the court does not believe sanctions are appropriate.  Citgo's assertions of interference are all based on inference and have not been affirmatively shown.  Citgo has provided the court with a statement from its local counsel indicating that two witnesses who were originally cooperative about appearing voluntarily for a deposition changed their minds.  Dkt. 114, Ex. 8.  A third employee of YPF who the local counsel contacted about appearing voluntarily already knew about the depositions and advised that he would not appear voluntarily.  *Id.*  Citgo's local counsel was of the opinion that the witnesses changed their mind about appearing or were unwilling to appear because somebody at YPF advised against it.  *Id.*  YPF provides a declaration from one of the witnesses stating that he originally told Citgo's local counsel that he did not know if he wanted to appear voluntarily and that he decided he did not want to voluntarily appear after that.  He asserts that nobody from YPF "instructed, suggested, or communicated to [him] in any manner that [he] not appear voluntarily for deposition.  To the contrary, it is [his] understanding that whether [he] appear[s] voluntarily for deposition is entirely [his] choice and that [he] would suffer no consequences if [he] chose to do so."  Dkt. 114, Ex. K.  This employee also noted that he had spoken with another person Citgo asked to voluntarily appear, who is a contractor for YPF, and advised that person that whether he appeared for deposition was "entirely his choice and that he would suffer no consequences if he chose to do so."  *Id.*

The court will not base an order of sanctions on Citgo's (or its local counsel's) inferences regarding the why witnesses changed their minds about testifying voluntarily.  Accordingly, Citgo's motion for sanctions, to the extent it is based on YPF's alleged interference with witnesses, is DENIED.

D.      **Rule 30(b)(6) Deponent**

Citgo also asserts that YPF should be sanctioned under Rule 37 because Gil was not prepared for the deposition and his appearance at the deposition without being prepared on the topics in the notice was equivalent to no appearance at all.  Dkt. 114.  This deposition occurred more than a year ago.  Citgo argues that it waited so long to file its motion for sanctions with regard to Gil because it was hoping to garner more evidence that the witness was unprepared by deposing other witnesses.  Dkt. 125.  Citgo has been unable, however, to depose more witnesses due to the issues with serving the witnesses under the Hague Convention.  The court finds this excuse plausible and will consider the motion for sanctions relating to the Rule 30(b)(6) deposition.

Under Rule 30(b)(6), an organization that has received a notice of deposition must "designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf; . . . .  The persons designated must testify about information known or reasonably available to the organization."  Fed. R. Civ. P. 30(b)(6).  The Fifth Circuit has stated that, in the case of a Rule 30(b)(6) deposition, "[w]hen a corporation . . . designates a person to testify on its behalf, the corporation appears vicariously through that agent.  If that agent is not knowledgeable about relevant facts, and the principal has failed to designate an available, knowledgeable, and readily identifiable witness, then the appearance is, for all practical purposes, no appearance at all."  *Resolution Trust Corp. v. S. Union Co., Inc.*, 985 F.2d 196, 197 (5th Cir. 1993).  Citgo argues that, despite the fact that thirteen of the nineteen topics in the deposition notice pertaining the YPF's procedures for vetting vessels and how these procedures were applied to the BOW FIGHTER, Gil did not speak with the person who inspected the BOW FIGHTER before his deposition, and he failed to even review any of YPF's manuals, policies, or procedures regarding the vetting process.  Dkt. 114; *see also* Dkt. 114 Ex. 2 (revised deposition notice).  YPF argues that Gil conducted a reasonable

and proper investigation and knew what YPF knew.  Dkt. 119.  YPF asserts that it does not have a specific vetting process because it relies on its corporate parent, Repsol, S.A., for all issues concerning the inspection, vetting, and approval of ships being used by YPF.  *Id.*

Gil testified that he prepared for all of the topics listed in the deposition notice issued in January 2012 some each day from late February 2012 until his deposition date on March 20, 2012. Dkt. 119 Ex. D at 113-14 (Mar. 21, 2012).  Gil stated that his review of documents relating to the topics in the January notice was "deeper" than the topics listed and that he felt he was prepared for all of the topics listed in the revised notice, dated March 9, 2012, even though he did not see the revised notice until the first day of his deposition.  *Id.* at 115-16.  As far as vetting, Gil testified that the vetting department was the Repsol Vetting Department, that YPF had two inspectors at the time who were YPF employees but who reported to the Repsol Vetting Department, and that Repsol Vetting made the final determination whether a ship was approved to charter.  *Id.* at 31-32 (Mar. 20, 2012).  The information regarding approval or rejection of a ship was held confidential between Repsol and the shipowner; YPF was only told whether a ship was approved or not.  *Id.* at 30-31, 47. YPF argues that since Repsol Vetting was in charge of vetting, not YPF, YPF does not know about the vetting and the information is not reasonably available to YPF.  Dkt. 119.

Corporations are not required to obtain information from an affiliate for a Rule 30(b)(6) deposition about matters in which the corporation was not involved.  *See In re Ski Train Fire of Nov. 11, 2000 Kaprun Austria*, No. MDL 1428(SAS)THK, 2006 WL 1328259, at *9 (S.D.N.Y. May 16, 2006) (finding that it is not reasonable to require a corporate parent to acquire all of the knowledge of its subsidiaries "*on matters in which the parent was not involved*" to testify to those matters during a Rule 30(b)(6) deposition (emphasis added)).  However, if the corporation has control over the information requested in the notice, even if it is actually knowledge of an affiliate rather than that

23

corporation, the corporation is obligated to provide that information.  *See Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.*, No. 01 CIV. 3016 (AGS) (HB), 2002 WL 1935439, at *4 (S.D.N.Y. Aug. 8, 2002) ("[T]he responding party should be obligated to produce the information under its control," which is "consistent with the judicial interpretations of the other discovery provisions . . . [and] is also consistent with the purpose of discovery . . . .").

Here, YPF argues that Gil did not need to be prepared to discuss topics about which YPF did not have knowledge, but it appears that YPF is intentionally shielding itself from this knowledge, as the vetting inspectors were actually *YPF* employees.  Whether they reported the information to Repsol or YPF is inconsequential in the analysis of whether the information was *reasonably available* to YPF or whether YPF has control over the information.  Information that YPF's employees had, whether they reported that information to Repsol instead of YPF, is most certainly available to YPF.  Moreover, Repsol, though YPF's parent, was essentially working for YPF when making the determination about whether the vessel YPF chose to perform its contract was appropriate.  It would be unreasonable to think that YPF could not easily ascertain what factors Repsol considered when making that determination for YPF.  The court therefore determines that YPF did not adequately prepare its corporate representative for the deposition.  Citgo's motion for sanctions is GRANTED.

The court finds that the appropriate sanction in this instance is a monetary sanction equivalent to the costs associated with traveling to Argentina to attend Gil's deposition and the attorneys' fees and costs associated with the actual deposition.  Since Citgo did not submit proof of its costs, the court hereby ORDERS Citgo to provide an affidavit with supporting documentation that indicates the exact amount expended by Citgo for the travel to Argentina and the deposition within ten days of the date of this order.

## IV. CONCLUSION

YPF's motion for summary judgment is DENIED.  Citgo's motion for sanctions is GRANTED IN PART AND DENIED IN PART.  It is GRANTED with respect to Citgo's complaint that YPF did not provide an adequate Rule 30(b)(6) deponent.  It is DENIED with respect to Citgo's complaint that YPF interfered with Citgo's ability to obtain voluntary depositions of certain witnesses.  Citgo shall provide an affidavit outlining costs as ordered above within ten days of the date of this order.  YPF's motion to file a surreply (Dkt. 128) is GRANTED.  Citgo's motion for continuance of submission date (Dkt. 115) is GRANTED.

It is SO ORDERED.

Signed at Houston, Texas on May 23, 2013.

Gray H. Miller
United States District Judge