# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| CITGO Petroleum Corporation, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action H-07-2950 |
| | § | |
| Odfjell Seachem, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## Order

Pending before the court are (1) a motion to dismiss and for summary judgment filed by defendant and third-party plaintiff YPF, S.A. ("YPF") (Dkt. 174); and (2) a motion to exclude Jay Webster filed by YPF (Dkt. 176).  Having considered the motion, response, reply, and applicable law, the court is of the opinion that the motion to dismiss and for summary judgment should be GRANTED and the motion to exclude should be DENIED AS MOOT.

## I. Background

The breach of contract case stems from a January 13, 2005 contract between YPF and Tricon Energy, Ltd. ("Tricon") for the sale of 4,000 MT of cyclohexane for $4,450,796.11.  Dkt. 1; Dkt. 174, Ex. 18 at 22.  The cyclohexane was to be shipped from Argentina  to Houston, Texas with a delivery window of February 15 through March 15, 2005.  Dkt. 1.  Tricon in turn entered into a contract with plaintiff CITGO Petroleum Corporation ("CITGO") on March 9, 2005, selling the cyclohexane to CITGO for $4,741,929.65, with a delivery window in Freeport, Texas of April 15 through April 20, 2005.  *Id.*  Both agreements indicated that the cargo would be shipped on the M/T BOW FIGHTER. Dkts. 101, Exs. A, B.  CITGO had a contract to sell the cyclohexane to BASF for $4,830,517.93 for delivery in Freeport.  Dkt. 174, Ex. 18 at 19, 22.

The BOW FIGHTER was selected because YPF's parent or affiliate company, Repsol YPF Trading and Transport, S.A., had a contract of affreightment with Odfjell Seachem, S.A. in which Odfjell provided ships to be chartered by the Repsol corporate family. Dkt. 175 (filed under seal). Odjfell provided one ship per month for shipments to the United States. Dkt. 174, Ex. 3, Vol. II at 12–13 (Gil Dep.) Repsol Vetting, not YPF, determined whether a vessel would be chartered. Dkt. 174, Ex. 3, Vol. I at 32. The only information available to YPF was whether the vessel was accepted by Repsol Vetting Department. *Id.*, Vol. 2 at 58.

OCIMF is an organization that works to improve the standard of vessels involved in petroleum operations. Dkt. 174, Ex. 4, Vol. 2 at 41. As of 2014, 96 petroleum companies were members of OCIMF. *Id.* at 43. In 1993, OCIMF developed an inspection program called SIRE. *Id.* at 42–43. "SIRE is a tanker risk assessment tool—a large database of up-to-date information about tankers and barges used by OCIMF members and programme recipients. It is a uniform, standardised, objective inspection process that systematically examines tanker operations." Dkt. 174, Ex. 8 ¶ 7. Members of OCIMF commission vessel inspections and appoint OCIMF-accredited SIRE inspectors to inspect vessels using SIRE standards. *Id.* The inspectors look at a wide range of items and upload their reports to the SIRE database. *Id.* Potential charters of a vessel may download the reports to help determine acceptability of a vessel. *Id.*

During the relevant timeframe, Repsol was an OCIMF member and the Repsol Vetting Department in Madrid, Spain, arranged for the inspection of the BOW FIGHTER. *Id.* ¶ 9. Captain Victor Genero, a Repsol inspector, inspected the BOW FIGHTER on March 9, 2005. Dkt. 174, Exs. 9, 10. Genero was a Category 1 SIRE inspector. Dkt. 174, Ex. 4, Vol 1 at 29. Genero's inspection took almost nine hours. Dkt. 174, Ex. 10 at YPF 0055. Genero transmitted his report to Repsol

Vetting. Dkt. 174, Ex. 4, Vol. 1 at 38. Repsol Vetting would consider this SIRE report, which was a "snapshot of the vessel at the time," as part of its decision on whether to accept the BOW FIGHTER. Dkt. 174, Ex. 8 ¶ 7. On March 15, 2005, Captain Lopez Krahe of Repsol Vetting sent Odjfell a list of deficiencies that must be corrected before Repsol Vetting would accept the BOW FIGHTER. Odjfell responded to each of the items on March 16, 2005. Dkt. 174, Ex. 11. Repsol then accepted the BOW FIGHTER for a six-month period. Dkt. 174, Ex. 4, Vol. 1 at 37–38; Ex. 4, Vol. 2 at 78.

The BOW FIGHTER did not arrive at the debarkation site until March 17, 2005. Dkt. 1. The cyclohexane was loaded on March 18 and March 19, 2005. Dkt. 174, Ex. 13. The BOW FIGHTER suffered an engine failure en route to Houston and had to divert to Philadelphia, Pennsylvania for repairs. Dkt. 1. The repairs took two months. *Id.* The cyclohexane was not discharged from the BOW FIGHTER until June 2005. *Id.*

In the interim, Tricon obtained cyclohexane to substitute for CITGO through a tanks swap with Conocco Phillips Chemicals. Dkt. 174, Exs. 19, 20. The delay, however, caused CITGO's delivery to BASF to be delayed. Dkt. 174, Ex. 18 at 22. BASF only paid CITGO $3,564,843.28. *Id.* CITGO paid $3,564,843.28 to Tricon. *Id.* This resulted in a loss of CITGO's anticipated profit of $88,979.85, a loss of profit to Tricon of $1,176,694.80, and a loss of $136,663.50 additional money that Tricon had to expend for shipping and logistical costs associated with the product swap. *Id.*

On May 20, 2005, Tricon advised CITGO that the terms and conditions of the March 9 agreement "expressly include delays of carriers due to breakdown or perils of the sea as a force majeure, and provide that in the event of a force majeure affecting us, we have the right, upon notice

3

in a reasonable time, to ship the quantities after force majeure has ended, on the same terms as in the contract." Dkt. 174, Ex. 21. Tricon reserved its right to make delivery under the force majeure provisions. *Id.* Tricon noted, however, that it valued its relationship with CITGO and hoped they would be able to arrive at "a mutually satisfactory resolution on a business base." *Id.* Tricon also advised that it intended to pursue appropriate claims against the vessel and its supplier. *Id.* On May 24, 2005, Tricon sent CITGO a letter noting that it had arranged for a swap allowing CITGO to obtain 30,000 barrels of cyclohexane in Port Arthur Texas, 20,000 barrels of which CITGO agreed to purchase at May prices. Dkt. 174, Ex. 22. Tricon again reiterated the force majeure clause and stated that it was not waiving that clause by arranging for the swap. *Id.*

On March 14, 2006, CITGO and Tricon, in order to avoid the cost of litigation, entered into a settlement agreement. Dkt. 174, Ex. 23. Tricon and CITGO released all claims against each other relating to the delivery and payment under the March 9, 2005 contract. Dkt. 174, Ex. 23. CITGO paid Tricon $850,000,000.00 towards its original sales price, and Tricon assigned or subrogated to CITGO all rights to recoup any loss against any potentially responsible parties, including Repsol YPF, S.A., the M/T BOW FIGHTER, and its owners. *Id.*; Dkt. 174, Ex. 18 at 22–23. Citgo thus, in this lawsuit, asserts a claim for $88,979.85 in its own right and $1,309,358.30 (the sum of Tricon's original lost profits and expenses associated with the cargo swap) as subrogee of Tricon. Dkt. 174, Ex. 18 at 23.

YPF now moves for dismissal of Citgo's claim for direct damages and summary judgment in its favor on Citgo's claim asserted on behalf of Tricon. Dkt. 174. YPF asserts that CITGO is not entitled to recover direct damages because it was not a third-party beneficiary of the contract between Tricon and YPF. *Id.* YPF argues that CITGO's claims as assignee or subrogee of Tricon also fail

because Tricon failed to mitigate its damages and that both the direct claims and the claims as assignee or subrogee of Tricon fail because (1) the damages claimed were not foreseeable when the YPF/Tricon contract concluded; (2) Citgo lacks an admissible expert opinion to support its claim that YPF failed to engage an appropriate carrier under the circumstances; and (3) Citgo has not established and cannot establish that YPF vetted and accepted the BOW FIGHTER. *Id.* With regard to the expert, YPF filed a separate motion to exclude the expert's testimony, asserting that CITGO's expert was not an OCIMF-accredited SIRE inspector, was in fact unfamiliar with SIRE standards, and thus unqualified to opine about the quality of the inspection. Dkt. 176.

CITGO argues that the court should allow it to bring claims on its own behalf under the pass-through claim doctrine. Dkt. 185. It contends that its claims and Tricon's claims were reasonably foreseeable at the time the YPF/Tricon contract concluded because YPF knew or should have known Tricon was in the business of reselling. *Id.* CITGO asserts that the testimony of its expert, who it claims is qualified, creates a question of fact as to whether the BOW FIGHTER was fit to carry the cargo in question, and it argues that the court has already held that YPF had a duty to engage a reasonable carrier under the circumstances, so its argument regarding YPF not vetting or accepting the BOW FIGHTER should fail. *Id.*; Dkt. 184.

## II. Legal Standard

### A. Motion to Dismiss

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1964–65 (2007) (quoting *Coneley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99 (1957)).

In considering a 12(b)(6) motion to dismiss a complaint, courts generally must accept the factual allegations contained in the complaint as true. *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982). The court does not look beyond the face of the pleadings in determining whether the plaintiff has stated a claim under Rule 12(b)(6). *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, [but] a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 127 S. Ct. at 1964–65 (citing *Sanjuan v. Am. Bd. of Psychiatry and Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994)) (internal citations omitted). And, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 127 S. Ct. at 1965. The supporting facts must be plausible—enough to raise a reasonable expectation that discovery will reveal further supporting evidence. *Id.* at 1959.

## B. Motion for Summary Judgment

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Carrizales v. State Farm Lloyds*, 518 F.3d 343, 345 (5th Cir. 2008). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; there must be an absence of any genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S. Ct. 2505 (1986). An issue is "material" if its resolution could affect the outcome of the action. *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007). "[A]nd a fact is genuinely in dispute only if

a reasonable jury could return a verdict for the non-moving party." *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).

The moving party bears the initial burden of informing the court of all evidence demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). Only when the moving party has discharged this initial burden does the burden shift to the non-moving party to demonstrate that there is a genuine issue of material fact. *Id.* at 322. If the moving party fails to meet this burden, then it is not entitled to a summary judgment, and no defense to the motion is required. *Id* . "For any matter on which the non-movant would bear the burden of proof at trial . . . , the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Transamerica Ins. Co. v. Avenell* , 66 F.3d 715, 718–19 (5th Cir. 1995); *see also Celotex*, 477 U.S. at 323–25. To prevent summary judgment, "the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986) (quoting Fed. R. Civ. P. 56(e)).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant and draw all justifiable inferences in favor of the non-movant. *Envtl. Conservation Org. v. City of Dallas, Tex.*, 529 F.3d 519, 524 (5th Cir. 2008). The court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence; disregard all evidence favorable to the moving party that the jury is not required to believe; and give credence to the evidence favoring the non-moving party as well as to the evidence supporting the moving party that is uncontradicted and unimpeached. *Moore v. Willis Ind. Sch.*

*Dist.*, 233 F.3d 871, 874 (5th Cir. 2000). However, the non-movant cannot avoid summary judgment simply by presenting "conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation." *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). By the same token, the moving party will not meet its burden of proof based on conclusory "bald assertions of ultimate facts." *Gossett v. Du-Ra-Kel Corp.*, 569 F.2d 869, 872 (5th Cir. 1978); *see also Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1221 (5th Cir. 1985).

### III. ANALYSIS

#### A.     Motion to Dismiss

YPF requests that the court dismiss CITGO's claim for direct damages under Federal Rule of Civil Procedure 12(b)(1) because CITGO does not have standing to bring the claim. Dkt. 174. YPF argues that CITGO was not a third-party beneficiary of the Tricon-YPF contract, which is the only basis of CITGO's direct damages. *Id.* Thus, according to YPF, Citgo cannot recover its direct damages under black letter Texas law. *Id.*

CITGO does not disagree that it cannot recover as a third-party beneficiary. *See* Dkt. 185. It argues, however, that the court should allow its claim to stand under the "pass-through doctrine." *Id.* In *Interstate Contracting Corp. v. City of Dallas*, the Texas Supreme Court discussed the evolution of pass-through claims and collected cases from the various states that had addressed whether to allow these claims. *See generally Interstate Contracting Corp.*, 135 S.W.3d 605 (Tex. 2004). The claims evolved because "federal law provides that subcontractors under government contracts do not have standing to sue the government without first establishing privity of contract." *Id.* at 611. Courts would allow the general contractor to bring claims against the government on the

subcontractor's behalf under the "pass-through doctrine" "if the general contractor remain[ed] liable to the subcontractor for the subcontractor's damages." *Id.* "Federal courts construe[d] this continued liability to the subcontractor as giving the contractor standing to pass the subcontractor's claims through to the government." *Id.* The Texas Supreme Court noted that eighteen states at the time, including New York, treated pass-through claims favorably. *Id.* at 613–14. The Texas Supreme Court noted that in Texas, a subcontractor likely could not recover from an owner unless it established privity of contract. *Id..* at 615. Instead, the subcontractor had to recover from the contractor, who could in turn recover from the owner. *Id.* The court held: "A contractor should be allowed to recover costs from the owner regardless of whether the contractor performed the work itself or through a subcontractor." *Id.* It noted that "pass-through claims distort litigation to a degree," but thought the concern did " not warrant prohibiting pass-through claims." *Id.* at 616–17. The court determined that requiring "instigation of separate litigation merely to provide the contractor standing if the contractor agrees to pursue the subcontractor's claims on a pass-through basis" was inefficient and that the reduction in unnecessary litigation outweighed the concerns the court had with adopting the doctrine. *Id.* at 617. The court, however, "explicitly confine[d] its rationale to construction contracts involving owners, contractors, and subcontractors." *Id.* at 618.

CITGO notes that "whether the pass-through doctrine applies to . . . the instant case is an open question." Dkt. 185 at 19. The court disagrees that it is open, since the Texas Supreme Court explicitly confined the doctrine to construction cases. Moreover, even if it could be considered an open question, the court would decline to broaden the doctrine when the Texas Supreme Court was so clear about its confines.

Because CITGO does not dispute that it cannot assert its direct claims as a third-party beneficiary and the court declines to expand the pass-through doctrine to apply to the facts of this case, YPF's motion to dismiss CITGO's direct claim for damages is GRANTED.

## B.     Motion for Summary Judgment

YPF argues that summary judgment should be granted in its favor because it could not have foreseen the damages that Tricon or CITGO incurred when it completed loading the cyclohexane onto the BOW FIGHTER. Dkt. 174 at 14. YPF states that it had no knowledge of either the Tricon-CITGO agreement or the CITGO-BASF agreement when it loaded the BOW FIGHTER. *Id.*

CITGO asserts that the Convention on Contracts for the International Sale of Goods ("CISG"), Article 74, expressly includes loss of profits as an element of recoverable damages if the lost profits were foreseeable at the conclusion of the contract. Dkt. 185 at 6. Here, CITGO argues that the lost profits claimed were foreseeable because YPF had reason to know that Tricon was merely a reseller. *Id.* at 7. CITGO states: "YPF does not deny that it had actual knowledge at the time Tricon entered into the contract with YPF that Tricon was a trader who would not be the ultimate user of the product . . . , not a manufacturer or consumer of the product." *Id.* at 8.

YPF argues in reply that CITGO has presented no evidence that YPF knew of Tricon's general line of business and that the lack of evidence is fatal to CITGO's claim, as foreseeability is necessary to prove both damages and proximate cause. Dkt. 186 at 1–2. YPF additionally argues that mere knowledge of the general line of business is not sufficient to make lost profits foreseeable. *Id.* at 2. YPF points out that even if it knew Tricon was a reseller, it could not possibly have foreseen that Tricon had a contract to move goods to third parties within days of its receipt of those goods. Dkt. 174 at 17.

YPF relies heavily on a case with which most first-year law students are familiar—*Hadley v. Baxendale*, an English common law decision from 1854. *See* Dkt. 174 at 15–16. CITGO argues that *Hadley* is 160 years old, did not involve the CISG or the Uniform Commercial Code of Sale of Goods, and that the Fifth Circuit has rejected any unwarranted extensions of *Hadley* resulting in arbitrary definitions of foreseeability. Dkt. 185 at 9 (citing *Hector Martinez & Co. v. S. Pacific Trans. Co.*, 606 F.2d 106, 109 (5th Cir. 1979)). YPF responds that "the old that is strong does not wither." Dkt. 186 at 2.

In *Hadley*, the court held:

> [T]he proper rule in such a case as the present is this:—Where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally, i.e., according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract., as the probable result of the breach. of it.

*Hadley v. Baxendale*, (1854) 156 Eng. Rep.145 (Court of Exchequer), 9 Exchequer Reports 341, 354. The case involved a contract to carry a broken mill shaft to a third party for the owners of the mill. The third party was going to use the broken shaft as a model to build a new one. The delivery of the shaft was delayed, and the millers sued for loss of profits due to an unreasonable delay, as the mill could not operate without the new shaft. The court reasoned:

> [I]n the great multitude of cases of millers sending off broken shafts to third persons by a carrier under ordinary circumstances, such consequences would not, in all probability, have occurred; and these special circumstances were here never communicated by the plaintiffs to the defendants. It follows, therefore, that the loss of profits here cannot reasonably be considered such a consequence of the breach of contract as could have been fairly and reasonably contemplated by both the parties when they made this contract.

*Id.* at 356.

The Texas Supreme Court noted, in 1981, that *Hadley v. Baxendale* was the "leading case on foreseeable consequence of contract damages." *Mead v. Johnson Grp., Inc.*, 615 S.W.2d 685, 687 (Tex. 1981). It pointed out that the rule stated in *Hadley* is "the rule in the majority of American jurisdictions and is recognized by the Restatement (Second) of Contracts." *Id.* (citing Restatement (Second) of Contracts § 351 (Tent. Draft No. 14, 1979)). In 1979, the Fifth Circuit also noted that the rule in *Hadley v. Baxendale* is "almost universally followed": "that general damages are awarded only if injury were foreseeable to a reasonable man and that special damages are awarded only if actual notice were given the carrier of the possibility of injury." *Hector Martinez & Co. v. S. Pac. Transp. Co.*, 606 F.2d 106, 109 (5th Cir. 1979). The court further explained that "[d]amage is foreseeable by the carrier if it is the proximate and usual consequence of the carrier's action." *Id.* (citing 11 Williston on Contracts § 1344, at 226 (3d ed. W. Jaeger 1968)).

In *Hector Martinez*, an agent of the plaintiff delivered a dragline to a carrier for shipment to Eagle Pass, Texas. 606 F.2d at 107. The bill of lading described the dragline as "used strip mining machinery and parts." *Id.* The dragline was damaged in transit, and the repairs took more than two months. *Id.* The plaintiff alleged that the delay caused damages because the dragline could not be used from the date it was scheduled to arrive until the date the repairs were finished. *Id.* The plaintiff requested damages for, among other things, the "wrongful deprivation of the dragline's use" during the delay. *Id.* at 107–08. The court noted that the common law covered the claim for damages. *Id.* at 108. The plaintiff argued that its loss resulting from the delay was reasonably foreseeable when he entered into the contract for transporting the dragline. *Id.* at 109. The court held that "[c]apital goods such as machinery have a use value, which may equal the rental value of

the equipment or may be an interest value. . . . It might be quite foreseeable that deprivation of the machine's use because of a carriage delay will cause a loss of rental value or interest value during the delay period." *Id.* The court further noted that the "amount of damages that was reasonably foreseeable involves a fact question that [the plaintiff] is entitled to present to the jury." *Id.* at 110.

The *Hector Martinez* court distinguished *Hadley*. *See id.* at 109. It noted that in *Hadley* it "was not obvious that the shaft . . . was an indispensable element of a mill." *Id.* The court ruled, however, that "it was obvious that the dragline is a machine which of itself has a use value." *Id.* The court stated that any cases that hold that an "injury resulting from loss of a machine's use are not foreseeable results of delayed transport . . . because it is not a usual consequence although it is a proximate consequence" are "unwarranted extensions of Hadley and employ arbitrary and inflexible definitions of foreseeability." *Id.* "It might be quite foreseeable that deprivation of the machine's use because of a carriage delay will cause a loss of rental value or interest value during the delay period." *Id.*

Here, of course, the cyclohexane is not a "machine," and the delay did not result so much in a delay of the cyclohexane's use as in a delay of reselling. Thus, analogizing to *Hector Martinez*, YPF would have had to foresee the delay in *reselling*. For this delay to be foreseeable, YPF would have needed to understand that Tricon was a reseller, not a company that purchased and used cyclohexane itself, and that Tricon had a short-term deal to resell the product. Citgo has, however, presented absolutely no evidence that YPF had any knowledge that Tricon was in the business of reselling. While certainly YPF *may* have known, such supposition does not rise to the level necessary to survive summary judgment. Rather, it was CITGO's burden to support the supposition by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). CITGO argues: "It is beyond doubt that the cyclohexane had an independent commercial use value, and known to any person, including YPF's sellers and traders, that a trader is just that – a trader – and does not retain the product for itself. YPF and Tricon had many previous dealings and YPF cannot suggest that it did not know Tricon was reselling the product." Dkt. 185. CITGO, however, does not provide any citations to support this argument. *See id.* YPF does not have to suggest whether it knew or did not know what Tricon was doing, it merely needs to point to the lack of evidence of foreseeability; CITGO must show that there is a question of fact as to whether it was foreseeable that Tricon and CITGO would suffer the losses they suffered if the ship on which the cyclohexane was loaded was not fit for its purpose. Because CITGO has not met its burden of providing evidence that there is a question of material fact, YPF's motion for summary judgment is GRANTED.[1]

## C. Motion to Exclude CITGO's Expert

YPF moves to exclude the testimony of CITGO's expert, Jay Webster. Because the court is granting summary judgment without considering that testimony, the motion to exclude (Dkt. 176) is DENIED AS MOOT.

---

[1] Because the court is granting summary judgment on YPF's foreseeability claim, it finds it unnecessary to address YPF's other arguments that regarding its entitlement to summary judgment.

## IV. Conclusion

YPF"'s motion to dismiss and motion for summary judgment (Dkt. 174) is GRANTED.

CITGO's claims are DISMISSED WITH PREJUDICE. YPF's motion to exclude CITGO's expert

(Dkt. 176) is DENIED AS MOOT.[2]

It is so **ORDERED**.

Signed at Houston, Texas on December 10, 2014.

Gray H. Miller
United States District Judge

---

[2] The court is aware that CITGO's motion to reinstate sanctions (Dkt. 166) is still pending. The court will address this motion prior to entering final judgment.